**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**RAYMOND GRIFFIN,**

**Plaintiff,**

**vs.**                                          **Case No. 2:04-CV-119**

**Magistrate Judge Norah McCann King**

**CITY OF HEATH, OHIO,** *et al.*,

**Defendants.**

**<u>OPINION AND ORDER</u>**

This is a civil rights action in which Raymond Griffin ("plaintiff") alleges that he was
subjected to unlawful force and was arrested without probable cause by the defendant police
officers Mark Emde, Mark Phillips and William Tittle, and that the defendant city, Heath, is also
liable for their conduct.  Plaintiff is proceeding under 42 U.S.C. § 1983 ("Section 1983 ") and
the common law of Ohio.  With the consent of the parties, 28 U.S.C. § 636(c), this matter is
before the Court on *Defendants City of Heath, Ohio, Mark Emde, Mark Phillips and William
Tittle's Motion for Summary Judgment* ("*Defendants' Motion for Summary Judgment*").  Doc.
No. 19.  For the reasons set forth below, *Defendants' Motion for Summary Judgment* is
**GRANTED** in part and **DENIED** in part.


**I.       FACTS**

A snow emergency was declared by the Mayor of the City of Heath on February 16,
2003.  *Complaint*, at 4.  The Mayor also issued an order requiring residents of the city to remove
their vehicles from all public roads.  *Raymond Griffin Deposition* ("*Pl. Dep.*"), at 24-25, attached

as *Exhibit A* to *Defendants' Motion for Summary Judgment*.  Heath police officers, as part of

their regular patrol duties, identified vehicles that were parked in violation of the Mayor's order.

*Deposition of Defendant Officer Mark Phillips* ("*Phillips Dep.*"), at 36-37, attached as *Exhibit B*

to *Defendants' Motion for Summary Judgment*.  When such a vehicle was found, police officers

attempted to contact the owner so that the owner could move the vehicle.  *Id.*  If the officer was

unable to locate the owner, the officer contacted a local towing company to tow the vehicle to

the police impound lot.  *Id.*  Several vehicles were impounded on February 16, 2003.  *Id.*

Plaintiff owns two vehicles that he had parked near his residence on February 16, 2003.

*Complaint*, at ¶ 6.  Plaintiff contends that his vehicles were parked several feet away from the

street.  *Pl. Dep.*, at 39.  Defendants, however, assert that plaintiff's cars were parked on the

street, in violation of the snow emergency order.  *Phillips Dep.*, at 38-39.

At approximately 3:30 p.m. on February 16, 2003, plaintiff's wife noticed police officers

outside their home brushing snow from the license plates of plaintiff's two vehicles.  *Pl. Dep.*, at

38.  Shortly thereafter, plaintiff received a call from a police dispatcher who informed him that

his two vehicles needed to be removed from the street because they were parked in violation of

the Mayor's snow emergency order.  *Id.*, at  39.  However, plaintiff could not move either

because they had been "plowed in."  *Id.*, at 40-41.  In addition, the battery in one of the cars was

dead.  *Id.*

Plaintiff contends that he informed the police dispatcher that his vehicles were not on the

street and that "it was not a problem."  *Id.*, at 27, 39.  Nevertheless, plaintiff's wife contacted a

towing company to have the cars towed to a neighbor's home and plaintiff went outside to await

the tow truck's arrival.  *Pl. Dep.*, at 41; *Deposition of Autumn Griffin*, at ¶ 2 ("*Griffin Aff.*"),

2

attached to *Plaintiff's Memorandum Contra Defendant's Motion for Summary Judgment* ("*Plaintiff's Memorandum Contra*").

Defendant officer Mark Emde, however, asserts that the police dispatcher informed him that plaintiff told the dispatcher that "he had no way to move the vehicles and to just impound them." *Emde Police Report*, attached to *Plaintiff's Memorandum Contra.* Officer Emde requested two wreckers to tow plaintiff's vehicles to the police impound lot. *Id.* Officer Emde denies that he knew that plaintiff had contacted a towing company until after the company the officer called was en route to plaintiff's residence. *Id.*

All parties agree that, after the telephone conversation between plaintiff and the police dispatcher ended, plaintiff and Officer Emde spoke outside plaintiff's home and that the officer informed plaintiff that a tow truck had been called to tow his vehicles to the police impound lot. *Emde Police Report*; *Pl. Dep.*, at 41; *Griffin Aff.*, at ¶ 2. Plaintiff contends that he asked Officer Emde why his cars were being towed when his neighbor's vehicle, to which he pointed, was closer to the street and was not being towed. *Pl. Dep.*, at 41-42. Plaintiff alleges that his vehicles were towed because he is African American and that his neighbor's vehicle was not towed because his neighbor is white. *Complaint*, at ¶¶ 7, 8, 20.

Defendants do not dispute that plaintiff's neighbor's car was not towed, but contend that

a multitude of potential reasons exist for the Defendant Officers' failure to impound [plaintiff's neighbor] Rick Paxton's vehicle. Mr. Paxton may have been contacted and would shortly be moving his vehicle. Similarly, during the Defendant Officers' random patrol of the area, they simply may not have driven that far yet and were deterred by Plaintiff's refusal of compliance.

*Defendants' Reply in Support of Motion for Summary Judgment* ("*Defendants' Reply*"), at 6.

At this juncture the parties' rendition of the events of February 16, 2003, differ sharply.

3

Officer Emde's police report of the incident relates the following:

> I exited my patrol car and spoke with the subject, later identified to me as
> Raymond Griffin.  Mr. Griffin immediately became verbally abusive towards this
> officer about his vehicles being impounded.  I attempted to calm Mr. Griffin
> down and explain to him why the vehicles were being towed.  During our
> conversation he continually used profanity and continued to move close towards
> this officer in an aggressive manner.  I advised Mr. Griffin to step away as I
> backed away to a safer distance.  It was obvious that Mr. Griffin was very
> agitated.  He was pointing his finger at me, stating I had something against him.  I
> continually tried to rationalize with Mr. Griffin.
>
> There had been some confusion about what wrecker company was actually going
> to take the vehicle.  Mr. Griffin had made other arrangements, but I was not aware
> of this.  I again explained that our Department had contacted two wreckers and
> they were already en route.  Mr. Griffin was now yelling that if I impounded his
> vehicles he was gong to "kick my ass" as he was walking towards me.  I again
> created distance and advised him to step back.  I also pulled my mace can out, this
> obviously being my only defense if an altercation ensued.  Taking into account
> Mr. Griffin's size and his threats I radioed for back up.  Mr. Griffin again stated
> he was going to "kick my ass."
>
> Shortly after requesting back up, Officers Tittle and Phillips arrived.  As soon as
> both officers exited their patrol car, Mr. Griffin immediately stated to Officer
> Tittle, "you better step the fuck back" pointing his finger in Officer Tittle's face.
> Mr. Griffin then directed his attention to Officer Phillips.  Mr. Griffin was now
> pointing his finger about two inches from Officer Phillip's face.  Officer Phillips
> advised Mr. Griffin to move his finger.  Mr. Griffin did not comply.  Officer
> Phillips moved Mr. Griffin's hand.  Mr. Griffin then forcefully shoved Officer
> Phillips with both hands.  Officer Phillips was almost knocked off balance.
>
> All officers immediately told Mr. Griffin he was under arrest.  Mr. Griffin was
> still verbally abusive and refusing to follow directions.  Mr. Griffin was further
> advised if he did not comply he would be sprayed with mace.  After it was
> apparent he was not going to comply, this officer and Officer Tittle sprayed Mr.
> Griffin directly in the face with defense spray.  All Officers continually ordered
> Mr. Griffin to put his hands behind his back that he was under arrest.  Mr. Griffin
> had now turned his back towards all Officers and grabbed two hand fulls of snow
> to clean his face.
>
> With his back towards us, Officer Phillips tackled Mr. Griffin knocking him to the
> ground.  As Mr. Griffin was knocked to the ground he attempted to get up, pull
> himself away from the Officers.  Officer Tittle struck Mr. Griffin in his left arm
> with an ASP baton.  This officer and Officer Tittle were putting all of our weight

on Mr. Griffin and ordering him to the ground. Mr. Griffin was still attempting to stand himself up. Officer (*sic*) then struck Mr. Griffin with the baton in the left rear thigh muscle to keep him from getting up. During the struggle all Officers repeatedly told Mr. Griffin to stop resisting. After the struggle Mr. Griffin was eventually placed in hand cuffs.

A Heath squad was immediately called to check Mr. Griffin from being sprayed with mace. Mr. Griffin was checked and transported to the Licking County Jail by this officer and Officer Tittle. While en route to LCJC, Mr. Griffin stated that this officer was the only one that should have struck him because he had made threats towards me.

*Emde Police Report.*

In his deposition, Officer Phillips corroborated Officer Emde's report, testifying, *inter alia*, that he witnessed plaintiff "screaming" profanities at Officer Emde, that plaintiff was "very physically threatening," that plaintiff pointed his finger one-half inch from Officer Phillip's face and that he said, "you better not fuck with me." *Phillips Dep.*, 42-49, 54. Officer Phillips continued that, even after plaintiff was informed that he was being placed under arrest and ordered to put his hands behind his back, plaintiff refused to comply, "acting very aggressive, very physical, screaming and yelling," which led to plaintiff being maced. *Id.*, at 47, 54, 57-58, 61-62, 64-65.

Plaintiff, however, testified that Officer Emde informed him that his cars were going to be impounded. *Pl. Dep.*, at 41. Plaintiff denies that he became physically threatening, screamed profanities; instead, plaintiff asserts that he only questioned the officer as to why his neighbor's vehicle was not being impounded when it was closer to the street than were plaintiff's vehicles. *Id.* Plaintiff also denies that he pointed his finger at Officer Phillips, or walked toward any officer in a threatening manner. *Id.*, at 44. Rather, plaintiff contends, he was pointing at, and walking toward, his neighbor's car. *Id.* In addition, plaintiff testified that the only profanity he

5

used was in response to Officer Emde's unprovoked threat to mace him, at which time plaintiff said:  "I will beat your ass right here in the street."  *Id.*, at 44.

With regard to the altercation between plaintiff and the defendant officers, plaintiff contends that, initially, Officer Tittle walked toward him in a threatening manner with his police baton in his hand and that Officer Phillips, without provocation, shoved plaintiff in the chest and "knocked [him] back a little."  *Id.*, at 47, 48.  Plaintiff claims that at that point he "lightly" pushed the officer on his left shoulder and said, "don't push me like that."  *Id.*, at 48.

Officer Emde maced plaintiff and Officer Tittle hit plaintiff's left arm with the police baton.  *Id.*, at 49.  After the macing, plaintiff  "walked right between Officer Phillips and Emde" to a large pile of snow.  *Id.*, at 49-50.  With his back towards the officers, plaintiff bent over and brought snow to his face.  *Id.*  After approximately ten seconds, plaintiff was tackled from behind by Officer Phillips, who pushed plaintiff's head toward the ground.  *Id.*, at 50.  Plaintiff asserts that he was trying to get onto his hands and knees but that Officer Emde got on his back, put his hands and arms around plaintiff's neck and choked and maced him in the face.  *Id.*, at 50-1.  While plaintiff was still on the ground, Officer Emde

> gets me and puts his hands behind my neck and his arm behind my neck, choking
> me, bringing me down and macing me in my face, smothering me with mace
> when I'm in a defenseless position.

*Id.*

In addition, plaintiff contends that Officer Tittle beat him on the back of his thigh so excessively that it caused bruising that lasted for six months.  *Id.*; *Griffin Aff.*, at ¶ 9.  Plaintiff insists that he was not resisting the officers while on the ground and that he said only "I can't, I can't, I can't, I can't," in response to being told to put his hands behind his back, referring to a

6

disability that kept him from putting his hands behind his back. *Pl. Dep.*, at 50, 51. Additionally, plaintiff asserts that he was unable to raise his left arm to push Officer Phillips with both hands, as defendants allege. *Id.*, at 50.

After the officers handcuffed plaintiff, his wife came outside and told the officers that plaintiff had a disability of his arm; the officers then attached more sets of handcuffs to those already on plaintiff so that the cuffs were not tight. *Id.*, at 56. The officers then helped plaintiff stand up and told him, for the first time, that he was under arrest. *Id.*, at 56-7. Plaintiff testified that he was not read his rights. *Id.*

Plaintiff's neighbor, William Bradley, testified that, from the window of his home, he saw a police officer on top of plaintiff while plaintiff was face down. He also saw "one officer swat [plaintiff] about three times with a stick on the back of his leg while he was on the ground-- one hit was hard." *William Bradley Affidavit* ("*Bradley Aff.*"), at ¶ 4, attached to *Plaintiff's Memorandum Contra*. Mr. Bradley also testified that he heard plaintiff yelling, "I can't, I can't." *Id.* In the time that Mr. Bradley observed these events, he did not witness plaintiff resisting, nor did he hear plaintiff use any profanity. *Id.*

All parties agree that an emergency squad was called to administer medical attention to plaintiff. *Pl. Dep.*, at 57; *Emde Police Report*. Plaintiff was then taken to the Heath Police Station and charged with disorderly conduct, resisting arrest and obstructing official business. *Pl. Dep.*, at 62; *Emde Police Report*. Two counts of disorderly conduct, one count of obstructing official business, one count of failure to comply and one count of resisting arrest were later added. *Id.* After a jury trial, plaintiff was found guilty of one count of disorderly conduct. *Id.*; *Pl. Dep.*, at 62.

7

## II.  STANDARD OF REVIEW

The standard for summary judgment is well established.  This standard is found in Fed.

R. Civ. P. 56, which  provides in pertinent part:

> The judgment sought shall be rendered forthwith if
> the pleadings, depositions, answers to interrogatories,
> and admissions on file, together with the affidavits, if
> any, show that there is no genuine issue as to any
> material fact and that the moving party is entitled to
> a judgment as a matter of law.

Fed. R. Civ. P. 56(c).  Pursuant to Rule 56(c), summary judgment is appropriate if "there is no

genuine issue as to any material fact . . . ."  In making this determination, the evidence must be

viewed in the light most favorable to the non-moving party.  *Adickes v. S.H. Kress & Co.*, 398

U.S. 144 (1970).  Summary judgment will not lie if the dispute about a material fact is genuine,

"that is, if the evidence is such that a reasonable jury could return a verdict for the non-moving

party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986).  However, summary judgment is

appropriate if the opposing party fails to make a showing sufficient to establish the existence of

an element essential to that party's case and on which that party will bear the burden of proof at

trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317,  322 (1986).  The mere existence of a scintilla of

evidence in support of the opposing party's position will be insufficient; there must be evidence

on which the jury could reasonably find for the opposing party.  *Anderson*, 477 U.S. at 251.

## III.  ANALYSIS

Plaintiff asserts claims under Section 1983 and under the common law of Ohio.  The

defendant officers contend that they are entitled to summary judgment based on the affirmative

defense of qualified immunity.

### A.    Section 1983 Claims against Defendant Officers

Section 1983 in relevant part provides:

> Every person who under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

42 U.S.C. § 1983.  By its terms, Section 1983 creates no substantive rights; it merely provides remedies for deprivations of rights created by the Constitution or laws of the United States. *Tuttle v. Oklahoma City*, 471 U.S. 808 (1985).

Plaintiff's claims are based on actions allegedly taken by Officers Emde, Tittle and Phillips while they were acting as police officers for the City of Heath.  "The affirmative defense of qualified, or good faith, immunity shields 'government officials performing discretionary functions . . . from [Section 1983] liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Gardenhire v. Schubert*, 205 F.3d 303, 310-11 (6th Cir. 2000) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  "An official may, however, be held personally liable for civil damages for unlawful official action if that action was not objectively reasonable in light of the legal rules that were 'clearly established' at the time it was taken."  *Id.*, at 311 (citing *Anderson v. Creighton*, 483 U.S. 635, 639 (1987)).  "This 'objective legal reasonableness' standard analyzes claims of immunity on a fact-specific, case-by-case basis to determine whether a reasonable official in the defendant's position could have believed that his conduct was lawful, judged from the perspective of the reasonable official on the scene."  *Id.* (citing *Graham v.*

9

*Connor*, 490 U.S. 386, 396 (1989)).

When determining whether a right is "clearly established," this Court must look first to decisions of the Supreme Court, then to decisions of the United States Court of Appeals for the Sixth Circuit and other courts within this circuit, and finally to decisions of other circuits. *See Daugherty v. Campbell*, 935 F.2d 780, 784 (6th Cir. 1991). "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Gardenhire*, 205 F.3d at 311 (citing *Creighton*, 483 U.S. at 640). However, "this not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful;  but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Creighton*, 483 U.S. at 640 (citations omitted).

"Where a defendant moves for summary judgment based on qualified immunity, the plaintiff must first identify a clearly established right alleged to have been violated and, second, establish that a reasonable officer in the defendant's position should have known that his conduct violated that right." *Gardenhire*, 205 F.3d at 311 (citing *Pray v. City of Sandusky*, 49 F.3d 1154, 1158 (6th Cir. 1995) and *Johnson v. Estate of Laccheo*, 935 F.2d 109, 111 (6th Cir. 1991)).  The ultimate burden of proof is on the plaintiff to show that the defendant is not entitled to qualified immunity.  *Id.* (citing *Wegener v. Covington*, 933 F.2d 390, 392 (6th Cir. 1991)).

With this framework in mind, the Court turns to the question of whether the defendant officers are entitled to summary judgment on the basis of qualified immunity.

1.  *Fourth Amendment:  Excessive Force*

 "The Sixth Circuit has repeatedly indicated that the right to be free from the use of excessive force in the context of a seizure is clearly established." *Phelps v. Coy*, 164 F. Supp. 2d

961, 974 (S.D. Ohio 2000), *aff'd* 286 F.3d 295 (6th Cir. 2002).

Plaintiff alleges that the defendant officers used excessive force when they arrested him on February 16, 2003. *Complaint*, at ¶¶ 10-13, 22; *Plaintiff's Memorandum Contra*, at 15. Plaintiff contends that his conduct did not warrant the use of any force, but that the officers pushed, maced and beat him with a police baton and then tackled him to the ground. *Pl. Dep.*, at 47-51. Even after the officers tackled him, plaintiff claims they continued to mace him and they began to choke him, beat him on the thigh with a police baton and force his hands behind his back in order to handcuff him. *Id.* Plaintiff maintains that he was not at the time resisting the defendant officers; rather, he was on his stomach, blinded by mace and defenseless. *Id.* Plaintiff also denies that he used profanity or threats toward the defendant officers but contends that Officer Phillips shoved him without reason. *Id.* However, plaintiff concedes that he stated to Officer Emde, "I will beat your ass right here in the street." *Id.*, 44. He also admits that he "lightly" shoved Officer Phillips' shoulder. Those actions, in plaintiff's estimation, did not warrant being maced, hit with a police baton (both before and after he was on the ground) and tackled to the ground by the defendant officers. *Id.*, at 48.

Defendants argue that, "[a]pplying the proper 'reasonableness' standard and analysis . . . the actions taken by the Defendant Officers were prudent in light of the circumstances." *Defendants' Motion for Summary Judgment*, at 11. The Court agrees in part and disagrees in part with defendants..

In *Graham v. Connor*, 490 U.S. 386, 396-97 (1989), the United States Supreme Court described the contours of an excessive force claim under the Fourth Amendment:

> The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision

11

of hindsight.  *See Terry v. Ohio*, 392 U.S. [1, 20-22 (1968)].  The Fourth Amendment is not violated by an arrest based on probable cause, even though the wrong person is arrested, *Hill v. California*, 401 U.S. 797 (1971), nor by the mistaken execution of a valid search warrant on the wrong premises, *Maryland v. Garrison*, 480 U.S. 79 (1987).

With respect to a claim of excessive force, the same standard of reasonableness at the moment applies: "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers," *Johnson v. Glick*, 481 F.2d [1028, 1033 (2nd Cir. 1973)], violates the Fourth Amendment.  The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments--in circumstances that are tense, uncertain, and rapidly evolving--about the amount of force that is necessary in a particular situation.

As in other Fourth Amendment contexts, however, the "reasonableness" inquiry in an excessive force case is an objective one:  the question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.  *See Scott v. United States*, 436 U.S. 128, 137-139 (1978); *see also Terry v. Ohio*, 392 U.S. at 21 (in analyzing the reasonableness of a particular search or seizure, "it is imperative that the facts be judged against an objective standard").  An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force;  nor will an officer's good intentions make an objectively unreasonable use of force constitutional.  *See Scott v. United States*, 436 U.S. at 138 (citing *United States v. Robinson*, 414 U.S. 218 (1973)).

490 U.S. at 396-97.

"*Graham* sets forth a list of factors relevant to the merits of the constitutional excessive force claim, 'requiring careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Saucier v. Katz*, 533 U.S. 194, 205 (2001).  "If an officer reasonably, but mistakenly, believed that a suspect was likely to fight back, for instance, the officer would be justified in using more force than in fact was needed." *Id.*

12

This Court concludes that the defendant officers' decision to initially mace plaintiff, to strike him in the arm with a police baton and to tackle him to the ground for the purpose of hand cuffing him was objectively reasonable. It is uncontroverted that plaintiff threatened to beat a police officer's "ass right [t]here in the street" in front of his home. *Complaint*, at ¶ 2; *Pl. Dep*., at 44. Additionally, plaintiff concedes that he shoved, however lightly, a police officer's shoulder. *Id.*, at 48. These uncontroverted facts constitute "circumstances that are tense, uncertain, and rapidly evolving," where the defendant officers were forced to make "split-second judgments" as to whether plaintiff would in fact initiate the threatened beating of Officer Emde or engage in more physical contact between plaintiff and the police officers. *See Graham*, 490 U.S. at 396.

Even if the officers had used more force than in fact was needed, the circumstances surrounding the events of February 16, 2003, and plaintiff's own conduct justified some force. *See Saucier*, 533 U.S. at 205 (2001). It was reasonable for the officers to believe, even if the belief was mistaken, that plaintiff could pose "an immediate threat to the safety of the officers" and that plaintiff "was likely to fight back," justifying the use of more force than may in fact been needed. *Id.*

Although the Court concludes that the defendant officers' activities up to and including the tackling of the plaintiff were objectively reasonable, the Court will separately analyze the reasonableness of the defendant officers' actions after plaintiff was tackled. *See Phelps v. Coy*, 286 F.3d 295, 301 (6th Cir. 2002) (citing *Dickerson v. McClellan*, 101 F.3d 1151, 1161-62 (6th Cir. 1996)).

The defendant officers maintain that plaintiff resisted arrest even while face down on the

13

ground and that the use of the police baton was therefore necessary.  Defendants deny that plaintiff was maced after he was tackled or that he was choked while on the ground.  Plaintiff, however, contends that, while he was on the ground, face down, blinded by mace and not resisting, the defendant officers continued to mace him, choke him and beat him with a police baton.

"Although, [this Court] must always weigh the government's interest justifying the use of force against the individual's interest in avoiding that force, *Cox*, 75 F.3d at 241, and [this Court] must add in the measure of deference due an officer's on-the-spot decisions, *see Saucier*, 121 S. Ct. at 2158, on the facts as we must take them, there was simply no governmental interest in continuing to beat [the plaintiff] after he had been neutralized, nor could a reasonable officer have thought there was." *Phelps v. Coy*, 286 F.3d at 301-02 (citing *Adams v. Metiva*, 31 F.3d 375, 386 (6th Cir. 1994) (use of force after suspect incapacitated by mace would be excessive as a matter of law); *McDowell v. Rogers*, 863 F.2d 1302, 1307 (6th Cir. 1988) (blow with nightstick to handcuffed, unresisting suspect would be gratuitous and therefore unreasonable); *Darnell v. Caver*, 1998 U.S. App. LEXIS 15390, No. 97-5297, 1998 WL 416000, at *3 (6th Cir. 1998) (after suspect thrown to ground, it was unreasonable for officer to lift suspect's head and let it drop to pavement)).

It bears reminding that, when determining whether the evidence raises a genuine issue of material fact as to whether defendant officers used excessive force under the standards established in *Graham*, this Court must construe the evidence in a manner most favorable to plaintiff, the party against whom summary judgment is sought.  So construing the evidence, the Court is compelled to conclude that there exists a genuine issue of material fact as to whether the

14

defendant officers used excessive force on February 16, 2003, after plaintiff was tackled to the ground.

Although the defendant officers contest plaintiff's version of the facts, "where . . . the legal question of qualified immunity turns upon which version of the facts one accepts, the jury, not the judge, must determine liability.' *Sova v. City of Mount Pleasant*, 142 F.3d 898, 903 (6th Cir. 1998)." *Pouillon v. City of Owosso*, 206 F.3d 711, 714 (6th Cir. 2000). *See also Berryman v. Rieger*, 150 F.3d 561, 562 (6th Cir. 1998) ("the defendant must be prepared to overlook any factual dispute and to concede an interpretation of the facts in the light most favorable to the plaintiff's case"); *Pray v. City of Sandusky*, 49 F.3d 1154, 1161 (6th Cir. 1995) (noting that summary judgment on the basis of qualified immunity "is not appropriate if there are factual disputes involving an issue on which the question of immunity turns, 'such that it cannot be determined before trial whether the defendant did acts that violate clearly established rights.' *Poe v. Haydon*, 853 F.2d 418, 426 (6th Cir. 1988)"); *Brandenburg v. Cureton*, 882 F.2d 211, 215-16 (6th Cir. 1989) (noting that many times "the jury becomes the final arbiter of [defendant-officer's] claim of immunity, since the legal question of immunity is completely dependent upon which view of the facts is accepted by the jury").

Accordingly, *Defendants' Motion for Summary Judgment* on plaintiff's claim of excessive force is **DENIED** to the extent that plaintiff claims that excessive force was administered after the point that he was tackled and face down on the ground; the motion is **GRANTED** to the extent that plaintiff claims that excessive force prior to the point that Officer Phillips tackled him to the ground, *i.e.*, the initial macing, striking with the police baton on the left arm and tackling plaintiff to the ground.

15

2.      *Fourth Amendment:  Malicious Prosecution*

On February 16, 2003, plaintiff was arrested by the defendant officers for disorderly conduct, resisting arrest and obstructing official business.  *Plaintiff's Memorandum Contra*, at 17-18; *Defendants' Motion for Summary Judgment*, at 14.  Plaintiff contends the defendant officers lacked probable cause to arrest him, that Officer Emde and Officer Tittle acted maliciously in filing charges against him and that the officers offered perjured testimony at plaintiff's criminal trial.  *Complaint*, at ¶¶ 13-15.

Defendants argue that they are entitled to summary judgment on this claim because the defendant officers possessed the requisite probable cause to arrest plaintiff and, consequently, plaintiff cannot establish a claim of malicious prosecution.  *Defendants' Motion for Summary Judgment*, at 13.  The Court agrees.

The United States Court of Appeals for the Sixth Circuit recognizes a constitutionally cognizable claim of malicious prosecution under the Fourth Amendment to the United States Constitution.  *Thacker v. City of Columbus*, 328 F.3d 244, 259 (6th Cir. 2003) (citing *Darrah v. City of Oak Park*, 255 F.3d 301, 310 (6th Cir. 2001)).  Although the Sixth Circuit "has yet to resolve the elements of a federal malicious prosecution claim, it is clear that a plaintiff must show, at a minimum, "that there was no probable cause to justify [a plaintiff's] arrest and prosecution."  *Id.*  Because this Court concludes that the defendant officers had probable cause to arrest plaintiff, it need not here attempt to enunciate what other elements may be necessary in a malicious prosecution claim.

"The Fourth Amendment states in pertinent part that 'no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be

16

searched, and the persons or things to be seized.'" *Id.* (citing U.S. Const. amend. IV).  "For probable cause to arrest to exist, the 'facts and circumstances within the officer's knowledge [must be] sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing or is about to commit an offense.'" *Crockett v. Cumberland Coll.*, 316 F.3d 571, 580 (6th Cir. 2003) (citing *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979)).  Whether there exists a probability of criminal activity is assessed under a reasonableness standard based on "'an examination of all facts and circumstances within an officer's knowledge at the time of an arrest.'"  *Id.* (quoting *Estate of Dietrich v. Burrows*, 167 F.3d 1007, 1012 (6th Cir. 1999)).  The existence of probable cause is a jury question, unless there is only one reasonable determination that is possible. *Gardenhire,* 205 F.3d at 315.

"The Fourth Amendment does not require that a police officer <u>know</u> a crime occurred at the time the officer arrests or searches a suspect . . . . The Fourth Amendment, after all, necessitates an inquiry into probabilities, not certainty."  *Thacker*, 328 F.3d at 256 (citing *United States v. Strickland*, 144 F.3d 412, 415 (6th Cir. 1998)) (emphasis in original).  Thus, a police officer need not have proof of each element of the offense for which the suspect is arrested.  *Id.*  Also, "'[d]ue weight' should be accorded to the judgments of law enforcement agents and other local law enforcement operatives that pre-arrest probable cause existed on a given set of facts." *Ross v. Duggan*, 402 F.3d 575, 585 (6th Cir. 2004) (citing *Ornelas v. United States*, 517 U.S. 690, 699 (1996)).

In the case *sub judice*, plaintiff's Fourth Amendment claim necessarily fails because of the uncontroverted fact that plaintiff was convicted by a jury of disorderly conduct in violation

of the Ohio Revised Code in connection with the events of February 16, 2003. *Exhibit C*,

attached to *Defendants' Motion for Summary Judgment*; *Emde Police Report*; *Pl. Dep.*, at 62. A

recent decision of this Court is directly on point. In *Donahue v. City of Pickerington*, Case No.

C2-03-742 (S.D. Ohio March 28, 2005) (J. Sargus), the plaintiff filed a complaint against the

City of Pickerington, two police officers, the city prosecutor and the city law director, alleging

violations of the Fourth Amendment in connection with his arrest and prosecution. *Id.*, at 3. The

plaintiff was initially arrested for persistent disorderly conduct; the defendants dismissed that

particular charge but, three days later, filed additional charges, including two counts of

trespassing and one count of disorderly conduct, all of which arose out of the same incident. *Id.*,

at 10. At the criminal trial, two of the charges were dismissed at the close of the prosecution's

case; however, the plaintiff was convicted of trespassing. *Id.* Summary judgment was granted

on the Section 1983 claim because plaintiff could not overcome two legal impediments to his

constitutional claim:

> The first impediment to Plaintiff's § 1983 claim arises from the holding in *Heck v.
> Humphrey*, 512 U.S. 477 (1994). In this case, an inmate brought a § 1983 action
> against various county prosecutors and state police investigations contending that
> they had engaged in an unlawful investigation leading to his arrest. He asserted
> that they had knowingly destroyed evidence which was exculpatory in nature and
> presented evidence at trial which they knew to be unlawfully obtained. The
> Supreme Court initially noted that the case involved a conflict between two
> important statutes, the first being § 1983 and the second being the federal habeas
> corpus statute, 28 U.S.C. § 2254. This latter enactment permits a party convicted
> in state court of challenging the constitutionality of his or her conviction through
> the filing of a federal habeas corpus petition. This remedy is, of course,
> ultimately available to the Plaintiff in this case.
>
> The Supreme Court resolved the tension between the two federal statutes and
> concluded:
>
> > We hold that, in order to recover damages for allegedly
> > unconstitutional conviction or imprisonment, or for other

18

> harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a §1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254.

*Donahue*, *supra*, (citing *Heck*, 512 U.S. at 486-87). This reasoning applies equally to the instant action. It is undisputed that plaintiff stands convicted of disorderly conduct, and plaintiff cannot challenge the validity of that conviction in the context of this action under Section 1983.

Moreover, the fact that plaintiff was arrested on certain criminal charges but later convicted on a different criminal charge is of no consequence:

> This argument too has been foreclosed by a recent decision of the United States Supreme Court in *Devenpeck v. Alford*, – U.S. – , 125 S. Ct. 588 (2004). As framed by the Supreme Court, the issue addressed in *Devenpeck* was whether probable cause for an arrest existed if the ultimate basis for justifying the arrest was not "closely related" to the offense stated by the arresting officer at the time the party was seized. The Supreme Court held:

>> In this case, the Court of Appeals held that the probable-cause inquiry is further confined to the known facts bearing upon the offense actually invoked at the time of arrest and, that (in addition) the offense supported by those known facts must be "closely related" to the offense that the officer invoked. . . . We find no basis in precedent or reason for this limitation.

> *Davenpeck*, 125 S. Ct. at 593 (citation omitted).

> In *Devenpeck,* the arresting officers initially charged Alford with unlawfully recording their conversations with him. Alford was originally suspected of impersonating a police officer. These latter-suspected charges were not brought against him. Instead, the only charge made against him was for unlawful recording. These charges were later dismissed.

> The Supreme Court held that the articulated charges on which the arrest was made

did not preclude a finding of probable cause that the officers had another alternate basis for the same arrest. The Supreme Court reiterated the holding in *Whren v. United States*, 517 U.S. 806 (1996), which held that an officer's subjective intention is irrelevant in the probable cause analysis. So long as the party arrested had in fact committed an offense, any analysis of the officer's subjective motivation is irrelevant. *Devenpeck*, 125 S. Ct. at 594. In this case, the same rule applies. The officer's motivation in charging the Plaintiff is of no consequence, since the charging decisions were ultimately validated by the jury verdict.

*Donahue*, *supra*.

In the case *sub judice*, plaintiff was originally charged with disorderly conduct, resisting arrest and obstructing official business in connection with the events of February 16, 2003. *Pl. Dep.*, at 62; *Emde Police Report*. The charges were later modified to include two counts of disorderly conduct, one count of obstructing official business, one count of failure to comply and one count of resisting arrest. *Id.* Plaintiff was eventually convicted of disorderly conduct in connection with those events. *Id.* Because plaintiff committed a criminal offense on that date, the defendant officers, as a matter of law, had probable cause to arrest him.

Accordingly, *Defendants' Motion for Summary Judgment* on plaintiff's claim of malicious prosecution is **GRANTED**.

> 3.    *Fourteenth Amendment:  Selective Enforcement*

The *Complaint* also alleges that, on February 16, 2003, defendants targeted him for enforcement of the Mayor's snow emergency order based on his race. Defendant officers respond that plaintiff does not sufficiently plead the claim. *Defendants' Reply*, at 4-5. Defendants further contend that, in any event, they are still entitled to the affirmative defense of qualified immunity. *Id.*, at 5-7.

> a.    Pleading selective enforcement

Defendant officers argue that plaintiff's selective enforcement claim should be dismissed

20

because plaintiff failed to plead purposeful discrimination on the part of the defendants or that similarly situated individuals were treated differently. *Defendants' Motion for Summary Judgment*, at 12; *Defendants' Reply*, at 4-5. The Court disagrees.

Pleading under the Federal Rules "is designed to give notice to the Court and other parties of the nature of the action and the relief sought." *Senter v. Gen. Motors Corp.*, 532 F.2d 511, 522 (6th Cir. 1976). In keeping with this purpose, a complaint need only set forth a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a).

In the *Complaint*, plaintiff claims that other vehicles were parked "much closer to the street than his two automobiles" and that plaintiff asked one of the defendant officers "why other vehicles which were closer to the street than his were not being towed." *Complaint*, at ¶¶ 7, 8. In addition, plaintiff alleges that he was treated differently from the owners of the other cars, *i.e.*, discriminated against, "on account of his race and color, Black African-American" in violation of the equal protection clause of the Fourteenth Amendment to the United States Constitution. *Id.*, at ¶ 20. The Court concludes that the *Complaint* sufficiently pleads a claim of selective enforcement.

   b.    Selective enforcement.

Plaintiff alleges in the *Complaint* that, because of his race, he was the subject of unlawful selective enforcement of the Mayor's snow emergency order.

"Sometimes the enforcement of an otherwise valid law can be a means of violating constitutional rights by invidious discrimination." *Futernick v. Sumpter Township*, 78 F.3d

1051, 1059 (6th Cir. 1996). To address this problem, courts have developed the doctrine of selective enforcement. *Id.* The standard for establishing a selective enforcement claim is a "demanding one." *Stemler v. City of Florence*, 126 F.3d 856, 873 (6th Cir. 1997). State actors benefit from a "strong presumption" that they have properly discharged their duties; only "clear evidence" to the contrary will overcome this presumption. *Id.*

The United States Court of Appeals for the Sixth Circuit "explained that 'selective enforcement claims are judged according to ordinary Equal Protection standards, which require a petitioner to show both a discriminatory purpose and a discriminatory effect.'" *Harajli v. Huron Township*, 365 F.3d 501, 508 (6th Cir. 2004) (citing *Gardenhire,* 205 F.3d at 318).

> "To establish discriminatory effect in a race case, the claimant must show that similarly situated individuals of a different race were not prosecuted." *United States v. Armstrong*, 517 U.S. 456, 465 (1996). A claimant can demonstrate discriminatory effect by naming a similarly situated individual who was not investigated . . . .

*Farm Labor Org. Comm. v. Ohio State Highway Patrol*, 308 F.3d 523, 534 (6th Cir. 2002).

Plaintiff alleges that his white neighbor was not asked to move his vehicle nor was his neighbor's vehicle towed throughout the snow emergency, even though, plaintiff alleges, it was parked in violation of the Mayor's snow emergency order. Defendants argue that plaintiff was not treated "differently than any other similarly situated resident of the City of Heath who, in a threatening manner, refused to abide by the Mayor's order and the Defendants Officers' request." *Plaintiff's Memorandum Contra*, at 12. However, the group to which defendants compare plaintiff is not the relevant group for purposes of determining a similarly situated individual in this instance.

To be considered similarly situated, an individual must be directly comparable in all

material respects. *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998). The relevant group of individuals for purposes of plaintiff's selective enforcement claim consists of those individuals, such as plaintiff's neighbor, whose vehicles were allegedly parked in violation of the Mayor's order yet who were neither asked to move the vehicles nor subjected to the towing of their vehicles. It is uncontroverted that Officer Emde called to have plaintiff's vehicles towed before he personally spoke with plaintiff and before any of the events giving rise to plaintiff's excessive force claim began.

Although defendants speculate as to why Mr. Paxton's vehicle was not towed,[1] the fact remains that plaintiff has presented uncontroverted evidence that he, an African American, was investigated for non-compliance with the snow emergency order while his neighbor, a Caucasian, was not. A "claimant can demonstrate discriminatory effect by naming a similarly situated individual who was not investigated." *Farm Labor Org. Comm.*, 308 F.3d at 534. Accordingly, the Court concludes that plaintiff has presented sufficient evidence to raise a material issue of fact with regard to the discriminatory effect of the defendant officers' actions.

However, plaintiff must also raise a genuine issue of material fact as to whether the defendant officers acted with a discriminatory purpose when they enforced the Mayor's snow emergency order against him. As an African American, plaintiff is a member of a suspect class

---

[1]

 A multitude of potential reasons exist for the Defendant Officers' failure to impound Mr. Paxton's vehicle. Mr. Paxton may have been contacted and would shortly be moving his vehicle. Similarly, during the Defendant Officers' random patrol of the area, they simply may not have driven that far yet and were deterred by Plaintiff's refusal of compliance.

*Defendants' Reply*, at 6.

and the *Complaint* alleges that he was the subject of illegal selective enforcement based on his membership in that class. However, in responding to the motion for summary judgment, plaintiff offers no evidence -- or even argument -- in support of the allegation that he was purposely discriminated against because of his race.[2] Instead, plaintiff contends that he was targeted for enforcement of the snow emergency order because he had recently filed a complaint against defendant Officer Phillips. Thus, plaintiff's claim of selective enforcement appears to be based on the officer's personal animosity toward plaintiff.[3]

The United States Court of Appeals for the Sixth Circuit "has indicated that a claim of selective enforcement, while not limited to the traditional 'suspect classes,' must nonetheless rest on membership in a class and a government actor's animus against that class. *See Futernick v. Sumpter Township*, 78 F.3d at 1057 n.8, 1059 (neither "mere arbitrariness" nor "personal animosity" is forbidden as a basis for selective enforcement under the Equal Protection Clause)." *Boone v. Spurgess*, 385 F.3d 923, 932 (6th Cir. 2004)(citations omitted). But, as the *Spurgess* court explained:

> This precedent, however, is completely undercut by the cryptically brief decision in *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000) (*per curiam*), in which the Supreme Court held that allegations that a municipality's demands for a larger easement than usual before connecting plaintiff to the municipal water supply were "sufficient to state a claim for relief under traditional equal protection analysis." *Id.* at 565.

_____

[2]Plaintiff may not simply rest upon the mere allegations in his pleading, but must set forth specific facts that show that there is genuine issue for trial. *See Agristor Financial Corp. v Van Sickle*, 967 F2d 233, 236 (6th Cir. 1992). Plaintiff has set forth no specific facts, or even an argument, that the defendant officers enforced the snow emergency order against him because of his race.

[3]It appears to the Court that plaintiff does not base this claim upon -- indeed, plaintiff does not even invoke -- the First Amendment.

24

> Under *Futernick*, a plaintiff must demonstrate that a government actor had a bad reason for enforcing the law against her and not against a similarly situated party; under *Olech*, a plaintiff can also demonstrate that an actor had no reason at all -- that the action had no rational basis.
>
> Presumably, the traditional rationale for disallowing selective enforcement claims -- that police resources are limited, and that only a fraction of those guilty of criminal activity can be prosecuted -- must survive *Olech* as a rational basis for police behavior; in order to make an equal protection selective enforcement claim, [the plaintiff] must therefore demonstrate either that [the defendant police officer] distinguished between [the plaintiff and the similarly situated individual] based on some bad reason, proving intent, *see Farm Labor Org. Comm. v. Ohio State Highway Patrol*, 308 F.3d 523, 533-34 (6th Cir. 2002), or that [defendant police officer] had no rational reason to distinguish between [the plaintiff and the similarly situated individual] . . . .

*Id.* (concluding that the defendant police officer had a rational basis for treating an off-duty police officer more favorably than a citizen when separating the two who were engaged in a fight because "the need to isolate one combatant in a fistfight is rational, as is the need to, say, seize one combatant at a time").

The Sixth Circuit and other circuits have been careful to circumscribe *Olech's* class-of-one equal protection claim because of its potential to effectively require federal court review of almost every executive and administrative decision made by state actors. *See Ross v. Duggan*, 402 F.3d 575, 587-88 (6th Cir. 2004); *Kirby v. City of Elizabeth City*, 388 F.3d 440, 447-48 (4th Cir. 2004); *Lauth v. McCollum*, 424 F.3d 631, 634 (7th Cir. 2005). Thus, in interpreting the standard set forth in *Spurgess*, this Court recently explained that:

> The Sixth Circuit interprets animus to mean "mere arbitrariness" or "personal animosity." *See Boone v. Spurgess*, 385 F.3d 923 (6th Cir. 2004). "Animus comes into play only when no rational reason being imaginable for injurious action taken by defendant against plaintiff, the action would be inexplicable but for animus." *Ross v. Duggan*, 402 F.3d 575, 589 (6th Cir. 2004).

*Benjamin v. Schuller*, 400 F. Supp. 2d 1055, 1080 (S.D. Ohio 2005).

25

In the instant action, personal animus simply cannot be inferred because several sound reasons can be hypothesized for the defendant officers' different treatment of plaintiff and his neighbor.  *See FCC v. Beach Communications*, 508 U.S. 307, 315 (1993) (governmental action only fails rational basis scrutiny if no sound reason for the action can be hypothesized, "if there is any reasonably conceivable state of facts that could provide a rational basis for the classification").  The Court need look no further than the "traditional rationale for disallowing selective enforcement claims -- that police resources are limited."  *See Spurgess*, 385 F.3d at 932.  Plaintiff has simply not offered "clear evidence" sufficient to overcome the "strong presumption" that the defendant officers properly discharged their duties.  Plaintiff has therefore not met the "demanding" standard that this Court must apply in a selective enforcement claim.  *See Stemler*, 126 F.3d at 873.

The Court concludes that plaintiff has not presented sufficient evidence to raise a genuine issue of material issue of fact with regard to the discriminatory purpose of the defendant officers' actions under the rational basis test.  Accordingly, *Defendants' Motion for Summary Judgment* on plaintiff's claim of selective enforcement is **GRANTED**.

**B.      Claims under Ohio Law Against the Defendant Officers**

Plaintiff also asserts against the defendant officers causes of action for assault and battery and abuse of process under Ohio law.  The defendant officers argue that they are entitled to qualified immunity on these claims under O.R.C. § 2744.03(A)(6) ("Ohio's immunity statute"), which provides in relevant part:

> (A) In a civil action brought against a political subdivision or an employee of a political subdivision to recover damages for injury, death, or loss to persons or property allegedly caused by any act or omission in connection with a governmental or proprietary function, the following defenses or immunities may

26

be asserted to establish nonliability:

. . . .

(6) In addition to any immunity or defense referred to in division (A)(7) of this section and in circumstances not covered by that division or sections 3314.07 and 3746.24 of the Revised Code, the employee is immune from liability unless one of the following applies:

> (a) The employee's acts or omissions were manifestly outside the scope of the employee's employment or official responsibilities;
>
> (b) The employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner;
>
> (c) Liability is expressly imposed upon the employee by a section of the Revised Code.

O.R.C. § 2744.03(A)(6)(a)-(c).

### 1. Assault and Battery

Plaintiff alleges that the defendant officers committed assault and battery during the course of the events that led to his arrest on February 16, 2003. *Complaint*, at ¶¶ 25-28. The United States Court of Appeals for the Sixth Circuit, construing Ohio law, has explained that a plaintiff's "state law claims for assault and battery rise and fall with his Fourth Amendment excessive force claim." *D'Agastino v. City of Warren*, 75 Fed. Appx. 990, 995 (6th Cir. Sept. 24, 2003); *Magrum v. Meinke*, 332 F. Supp.2d 1071, 1083 (N.D. Ohio 2004). That is, "if an officer uses more force than is necessary to make an arrest and protect himself from injury, he is liable for assault and battery . . . ." *D'Agastino*, 75 Fed. Appx. at 995 (quoting *City of Cincinnati v. Nelson*, 1975 Ohio App. LEXIS 7443, at *5 (Hamilton County May 5, 1975)); *see also Drolesbaugh v. Hill*, 64 Ohio St. 257 (Ohio 1901); *Schweder v. Baratko*, 103 Ohio App. 399 (Cuyahoga County 1957). *D'Agastino* reversed the district court's conclusion that the defendant officers were entitled to immunity under Ohio's immunity statute, reasoning that, because

27

summary judgment could not be granted to the defendant officer on the plaintiff's Section 1983

excessive force claim, there was necessarily a genuine issue of material fact as to whether the

officer's use of force was malicious or undertaken in bad faith or in a wanton or reckless manner.

*D'Agastino*, 75 Fed. Appx. at 995 (citing O.R.C. § 2744.03(A)(6)(b)).

In the case *sub judice*, the Court has already determined that there remains a genuine

factual dispute as to whether defendants used excessive force after tackling plaintiff to the

ground. Defendants are therefore not entitled to summary judgment on plaintiff's parallel state

law claim for assault and battery. Accordingly, *Defendants' Motion for Summary Judgment* on

plaintiff's claim of assault and battery is, to this extent, **DENIED**.

    *2.    Abuse of process*

Plaintiff alleges that, on February 16, 2003, the defendant officers placed him under

arrest without probable cause, because of his race. *Complaint*, at ¶ 13. Further, he alleges that

the defendant officers' actions demonstrated their intent to pervert the legal proceedings taken

against him in an attempt to accomplish an ulterior purpose for which the proceedings were not

designed. *Id.*, at ¶ 14.

To establish a claim of abuse of process under Ohio law, plaintiff must show that (1) a

legal proceeding has been commenced in proper form and with probable cause; (2) the

proceeding has been perverted to attempt to accomplish an ulterior motive for which it was not

designed; and (3) direct damage has resulted from the wrongful use of process. *Hahn v. Star

Bank*, 190 F.3d 708, 718 (6th Cir. 1999) (quoting *Yaklevich v. Kemp, Schaeffer, & Rowe Co.*, 68

Ohio St. 3d 294, 297 (1994)).

Plaintiff claims that legal process against him was perverted and used for a purpose for

which it was not designed in that the officers fabricated the allegations against plaintiff in order

to retaliate against him for filing a racial profiling complaint against Officer Phillips.  *Id.*

*Plaintiff's Memorandum Contra*, at 21.  Additionally, plaintiff contends that the defendant

officers's ulterior motive in selectively enforcing the Mayor's snow emergency order against

him was racial discrimination.  *Id.*  Finally, plaintiff claims that he was damaged by the officers'

misuse and abuse of the criminal justice system because he was found guilty of disorderly

conduct.  *Id.*

Even if these statements are true, they cannot form the basis of a claim of abuse of

process.  "The key to the tort of abuse of process is 'the purpose for which process is used once

it is issued.'"  *Gliatta v. Tectum, Inc.*, 211 F. Supp.2d 992, 1010 (S.D. Ohio 2002) (citing

*Clermont Environmental Reclamation Co. v. Hancock*, 16 Ohio App. 3d 9, 11 (Clermont Co.

1984)).  Abuse of process will not lie for the wrongful initiation of an action but for the improper

use, or "abuse" of process, *i.e.*, using process with an "ulterior motive" or collateral objective.

*Gliatta*, 211 F. Supp.2d at 1010.  *See also* 4-34 Business Torts § 34.04, Matthew Bender & Co.

(2005) (abuse is using the process as "a threat to coerce or extort some collateral advantage not

properly involved in the proceeding").  Moreover, there must be "a further act in the use of

process not proper in the regular course of conduct of the proceeding."  *Gliatta*, 211 F. Supp.2d

at 1010.  If one uses process properly, but with a malicious motive, there is no abuse of process.

*Id.*

In *Gliatta*, this Court explained the tort of abuse of process with the following example:

In *Kremer v. Cox*, 114 Ohio App. 3d 41, 52 (Summit Co. 1996) a physician
instituted suit against another physician for, *inter alia*, abuse of process for
allegedly causing him humiliation and embarrassment by instituting an earlier
suit.  The court held that the claim could not succeed because abuse of process

29

does not lie for the wrongful bringing of an action.  Plaintiff in that case alleged
that the suit was brought against him without a probable basis. The court
concluded that if the Plaintiff had alleged that the suit was brought with a
probable basis but that the process instituted was somehow "perverted," Plaintiff's
abuse of process claim would have had merit.

*Id.*

Plaintiff, like the plaintiff in *Gliatta,* complains that defendants' actions were unlawful

from the outset.  In essence, plaintiff argues that the judicial proceedings against him should not

have been brought, *i.e.*, they were brought for an improper, ulterior motive.  Plaintiff offers no

evidence that the defendant officers used the judicial proceedings to coerce or extort some

collateral advantage not properly involved in the criminal proceedings.

Plaintiff has not raised a genuine issue of material fact with regard to this claim and

defendants are entitled to summary judgement on this claim.  Under these circumstances, the

Court need not determine whether the defendant officers are entitled to immunity under Ohio's

immunity statute.  Accordingly, *Defendants' Motion for Summary Judgment* on plaintiff's abuse

of process claim is **GRANTED**.

### 3.    *Intentional Infliction of Emotional Distress*

Plaintiff alleges that the defendant officers knew or should have known that their actions

on February 16, 2003, would result in serious emotional distress because their conduct was so

extreme and outrageous as to go beyond all bounds set forth in a reasonable society.  *Complaint*,

at ¶ 31.  Under Ohio law, "'one who by extreme and outrageous conduct intentionally or

recklessly causes severe emotional distress to another is subject to liability for such emotional

distress, and if bodily harm to the other results from it, for such bodily harm.'"  *Yeager v. Local

Union 20*, 6 Ohio St.3d 369, 374 (1983) (citing Restatement of the Law 2d, Torts (1965) 71,

30

§ 46(1)).  The Ohio Supreme Court has described conduct that is "extreme and outrageous":

> It has not been enough that the defendant has acted with an intent which is
> tortious or even criminal, or that he has intended to inflict emotional distress, or
> even that his conduct has been characterized by "malice," or a degree of
> aggravation which would entitle the plaintiff to punitive damages for another tort.
> Liability has been found only where the conduct has been so outrageous in
> character, and so extreme in degree, as to go beyond all possible bounds of
> decency, and to be regarded as atrocious, and utterly intolerable in a civilized
> community. Generally, the case is one in which the recitation of the facts to an
> average member of the community would arouse his resentment against the actor,
> and lead him to exclaim, "Outrageous!"

*Id.*, at 374-75.  The Ohio Supreme Court has also defined serious emotional distress:

> By the term serious, we of course go beyond trifling mental disturbance, mere
> upset or hurt feelings.  We believe that serious emotional distress describes
> emotional injury that is both severe and debilitating. . . .  A non-exhaustive litany
> of some examples of serious emotional distress should include traumatically
> induced neurosis, psychosis, chronic depression, or phobia.  *Paugh v. Hanks*, 6
> Ohio St.3d 72, 78 (1983). Courts applying Ohio law have sought some evidence
> showing hospitalization or medical treatment with regard to a diagnosable
> psychiatric condition.

*Hart v. Paint Valley Local Sch. Dist.*, 2002 U.S. Dist. LEXIS 25720, *49-52 (S.D. Ohio 2002)

(citing as an example *Katterhenrich v. Fed. Hocking Local Sch. Dist. Bd. of Educ.*, 121 Ohio

App.3d 579 (1997)).

This Court concludes that plaintiff has not pointed to a genuine issue of material fact

sufficient to meet the high standard for extreme and outrageous behavior with respect to his

claim of intentional infliction of emotional distress.  Furthermore, plaintiff has presented no

evidence that he has actually suffered extreme emotional distress.  Accordingly, *Defendants'*

*Motion for Summary Judgment* on plaintiff's claim of intentional infliction of emotional distress

is **GRANTED**.

### C.      Federal and State Law Claims Against Defendant City of Heath

In his *Complaint*, plaintiff alleges that the defendant City of Heath either knew or should have known of the unlawful acts of the defendant police officers, and yet did nothing to prevent them. *Complaint*, at ¶ 17. In addition, plaintiff alleged that defendant City of Heath failed to properly train and supervise the defendant police officers, which failure caused the unlawful acts and practices about which plaintiff complains. *Id.* Finally, the *Complaint* alleged that the acts of the defendant City of Heath "were intentional, malicious and with wrongful disregard for the rights of the plaintiff." *Id.*, at ¶ 18. The defendant city seeks summary judgment on these claims. A local government may be held liable for the claimed constitutional tort of its employee only if the tort was caused by a policy or custom of the governmental employer. *See Monell v. New York City Dept. of Social Serv.*, 436 U.S. 658, 690 (1978).

> Any discussion of municipal liability under § 1983 begins with *Monell v. Department of Social Services*, 436 U.S. 658 (1978). In *Monell*, the Supreme Court held that municipalities can be sued directly under § 1983 where the action of the municipality itself can be said to have caused the harm, as when "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Id.* at 690. Municipal liability for the actions of employees may not be based on a theory of *respondeat superior*. *Monell* went on to clarify that municipal liability may be predicated upon grounds other than explicit expressions of official policy:

>> Moreover, although the touchstone of the § 1983 action against a government body is an allegation that official policy is responsible for a deprivation of rights protected by the Constitution, local governments, like every other § 1983 "person," by the very terms of the statute, may be sued for constitutional deprivations visited pursuant to governmental "custom" even though such a custom has not received formal approval through the body's official decisionmaking channels. 436 U.S. at 690-91.

*Phelps v. Coy,* 164 F. Supp.2d at 975-76. *See also*, *Berry v. City of Detroit*, 25 F.3d 1342 (6th Cir. 1994) (explaining *Monell*). In *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986), the

Supreme Court noted that "the 'official policy' requirement was intended to distinguish acts of the municipality from acts of employees of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible." *Id.* at 479-80.

It is a plaintiff's burden to present evidence that a defendant city failed to properly train, supervise and discipline its officers or that it failed to properly investigate any alleged wrongdoing. *Canton v. Harris*, 489 U.S. 378, 390 (1989). Furthermore, plaintiff must establish that the defendant city's failure to take these actions proximately caused his claimed injuries. *See Id.* Finally, plaintiff must at least present evidence that the defendant city's failure to satisfy its obligations amounted to deliberate indifference to plaintiff's constitutional rights.

Moreover, Ohio law, O.R.C. § 2744.02(A)(1), confers immunity from monetary liability in connection with state law claims asserted against governmental entities under certain circumstances:

> Except as provided in division (B) of this section, a political subdivision is not liable in damages in a civil action for injury, death, or loss to a person or property allegedly caused by any act or omission of the political subdivision or an employee of the political subdivision in connection with a governmental or proprietary function.

The Ohio Supreme Court has established a three step approach for determining whether a political subdivision is immune from liability under O.R.C. § 2744.02. *Cater v. Cleveland,* 83 Ohio St. 3d 24, 28 (Ohio 1998). After it is determined that the political subdivision is presumptively entitled to immunity under §2744.02(A)(1), it must then be determined whether one of the five exceptions to immunity, listed in subsection (B), apply. *Cater,* 83 Ohio St. 3d at 28. If any one of these exceptions applies, the Court must then consider whether any of the

33

defenses listed in §2744.03 also apply so as to "reinstate" the immunity. *Id.*

The City of Heath qualifies as a "political subdivision" of the State of Ohio as defined by the statute. *See* O.R.C. § 2744.01(F). Furthermore, this Court concludes that the operation of a police department is a "governmental function" as defined by the statute. *See* O.R.C. § 2744.01(C)(2)(a), (b), (I). Therefore, the City of Heath is presumptively entitled to the general immunity afforded by § 2744.02(A)(1).

Moreover, this Court concludes that none of the exceptions listed in § 2744.02(B) apply to the facts of this case. "Ohio courts have consistently held that political subdivisions, particularly those acting in a governmental capacity, are exempt from intentional tort claims, reasoning that Ohio Rev. Code § 2744.02(B) does not provide a specific exception for intentional torts." *Woods v. Miamisburg City Schools*, 254 F. Supp. 2d 868, 880 (S.D. Ohio 2003) (citations omitted). Therefore, the City of Heath is immune from monetary liability on plaintiff's state law claims. *See Feitshans v. Darke County, Ohio*,116 Ohio App.3d 14, *28 (Darke Cty. Ct. App. 1996). *See also Carter,* 83 Ohio St. 3d at 28.

In any event, plaintiff has not responded to defendants' argument that the defendant city is entitled to summary judgment. Because plaintiff may not simply rest upon the allegations complaint, but must instead come forward with specific facts that show that there is a genuine issue for trial, *Agristor Financial Corp. v Van Sickle*, 967 F2d at 236; Fed. R. Civ. P. 56(e), plaintiff has not met his burden in defending against the city's motion for summary judgment. Accordingly, as it relates to the defendant city, *Defendants' Motion for Summary Judgment* is

34

**GRANTED**.[4]

**WHEREUPON**, in light of the foregoing, *Defendants' Motion for Summary Judgment*, Doc. No. 19, is **GRANTED** in part and **DENIED** in part.  Specifically:

1.  *Defendants' Motion for Summary Judgment* on plaintiff's Section 1983 claim of excessive force is **DENIED** with respect to that portion of plaintiff's claim that alleges excessive force after plaintiff was face down on the ground and **GRANTED** with respect to that portion of plaintiff's claim that alleges excessive force prior to that point, *i.e.*, the initial macing, striking with the police baton on the left arm and the tackle to the ground.

2.  *Defendants' Motion for Summary Judgment* on plaintiff's Section 1983 claim of malicious prosecution is **GRANTED**.

3.  *Defendants' Motion for Summary Judgment* on plaintiff's Section 1983 claim of selective enforcement is **GRANTED**.

4.  *Defendants' Motion for Summary Judgment* on plaintiff's state law claim of abuse of process is **GRANTED.**

5.  *Defendants' Motion for Summary Judgment* on plaintiff's state law claim of assault and battery is **GRANTED** and **DENIED** to the same extent that his claim of excessive force is granted and denied.

6.  *Defendants' Motion for Summary Judgment* on plaintiff's state law claim of intentional infliction of emotional distress is **GRANTED**.

7.  *Defendants' Motion for Summary Judgment* on plaintiff's state and federal claims against the City of Heath is **GRANTED**.

---

[4]Because a claim against a governmental employee in his official capacity is "only another way of pleading an action against an entity of which an officer is an agent," *Monell, supra*, 436 U.S. at 690 n.55, to the extent that the *Complaint* asserts claims against the defendant officers in their official capacities, those claims cannot proceed.  *See also, Brandon v. Holt*, 469 U.S. 464, 471-72 (1983).

March 21, 2006                     _s/Norah McCann King_____
Date                               Norah McCann King
                                   United States Magistrate Judge